UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
INTELLI-CHECK, INC.,                    :
                                        :
                     Plaintiff,         :          **MEMORANDUM AND ORDER**
                                        :          03 CV 3706 (DLI) (ETB)
         -against-                      :
                                        :
TRICOM CARD TECHNOLOGIES, INC., :
MARK BAUGHMAN and STEPHEN               :
STONE,                                  :
                                        :
                     Defendants.        :
-----------------------------------------------------X
**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Intelli-Check, Inc. ("Intelli-Check") filed suit against TriCom Card Technologies,

Inc. ("Tricom"), a closely held corporation, and its two shareholders, Mark Baughman, and Stephen

Stone (collectively, "Defendants"), alleging that the Defendants' use of certain electronic

identification and age verification technology infringed a patent it held. During the course of this

litigation, the parties have briefed numerous issues. Presently before the court is Intelli-Check's

motion seeking the disqualification of defense counsel, the law firm of Kelley Drye and Warren LLP

("Kelley Drye"), from any further involvement due to a conflict of interest.[1] Defendants oppose this

motion. For the reasons set forth more fully below, Intelli-Check's motion to disqualify Kelley Drye

as defense counsel is denied.

---

[1]     The court notes that Intelli-Check previously sought to disqualify defense counsel
in a motion that Magistrate Judge E. Thomas Boyle denied. (*See* December 22, 2005
Memorandum & Order, Docket Entry No. 153.)

## BACKGROUND

For the duration of this litigation, the law firm of Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C. (the "Gibbons law firm"), has represented Intelli-Check. The law firm of Collier Shannon Scott, LLP ("Collier Shannon") began joint representation of Defendants in August 2006. David Yohannon, Thomas Gilbertsen, and Basil Culyba managed the Defendants' litigation team.[2] Collier Shannon continued to represent Defendants until it merged with Kelley Drye. Shortly after the merger, Kelley Drye became the counsel of record for Defendants. The instant motion for disqualification centers on a former associate of the Gibbons law firm, Robert Schumacher. While at that firm, Schumacher was on the Intelli-Check litigation team. He left that firm in July 2004 to join Kelley Drye. The Kelley Drye-Collier Shannon merger occurred two years later.

During this litigation, Kevin J. McKenna and Vincent E. McGeary, two partners at the Gibbons law firm, managed the Intelli-Check litigation team. (McGeary Decl., ¶ 2.) Schumacher joined the team as a third-year associate and remained on the team until he left the firm a year later. (*Id*. at ¶¶ 3-5.) Schumacher worked on a number of tasks. In preparation of filing the complaint, Schumacher researched and analyzed several legal issues including venue, personal jurisdiction, and the Lanham Act. (*Id.* at ¶ 7.) He drafted the initial and amended complaints, a deposition outline, Intelli-Check's interrogatories, and Intelli-Check's responses to Defendants' interrogatories. (*Id.* at ¶ 8.) He conducted third-party discovery and communicated with opposing counsel without supervision. (*Id.* at ¶¶ 5, 11.)

---

[2] As discussed below, Collier Shannon was based in Washington, D.C. Reed Smith LLP served as local counsel, and continues to do so.

Intelli-Check asserts that Schumacher spoke to Intelli-Check's Chief Executive Officer and Chairman, Frank Mandelbaum, on several occasions (Mandelbaum Decl., ¶¶ 11-12); however, Schumacher indicated that he participated in only one call with Mandelbaum, during which McKenna led the conversation. (Schumacher's Decl., ¶ 9.) Schumacher was copied on several electronic and paper correspondences between the Gibbons law firm and Mandelbaum. (*Id.*) He billed a total of 238.4 hours to Intelli-Check (*Id.* at ¶ 4), and in his exit interview, characterized himself as "the primary associate in charge of the litigation." (McGeary Decl., Exh. A.)

He then joined Kelley Drye, which, at that time, had not represented Tricom in any prior proceedings. Thus, at the time of his lateral move, and until the merger occurred, there was no conflict. (Def. Mem. at 3.) Prior to the merger, Kelley Drye and Collier Shannon conducted a series of conflict checks to determine whether representation of either firms' current or former clients presented a problem. (Heck Decl., ¶ 3.) These conflict checks did not include an examination of the former clients of laterally hired associates. (Def. Mem. at 4.) As a result, Kelley Drye did not discover Schumacher's role in the instant action prior to the merger.[3] (Heck Decl., at ¶ 3.)

After leaving the Gibbons law firm, Schumacher continued occasional communications with Jason Oliver, a former colleague. In one such communication, which occurred on February 16, 2006,

---

[3]     Intelli-Check disputes this assertion, contending that Yohannan had knowledge of the conflict prior to the merger, based on a conversation that occurred in a Florida airport in December 2004, between Yohannon and an associate from the Gibbons law firm, Jason Oliver. (Pl. Mem. at 15-17.) Oliver contends that he informed Yohannon that Schumacher had joined Kelley Drye. (Pl. Mem. at 5.) Yohannan denies any memory of this conversation (Yohannan Decl., ¶ 4), which is reasonable considering the circumstances. This conversation occurred two years before the merger, at a time when it is unlikely that either firm had conceived of the merger or undertaken any steps to pursue it. It is unreasonable to expect Yohannan to remember the whereabouts of an adversary whom he opposed for just one year much beyond the time of the conversation and certainly not two years afterwards.

Schumacher sent an email to Oliver entitled, "Yo, Yohannan" and attached an article discussing the potential Kelley Drye-Collier Shannon merger. (Oliver Decl., Exh. A.) The article briefly mentioned the on-going conflict checks required to clear the way for the merger. (*Id.*) Despite his awareness of the impending merger, Schumacher did not alert Kelley Drye to his potential conflict. (Schumacher Decl., ¶ 15.)

On April 17, 2006, the day Kelley Drye announced the merger, Schumacher emailed Oliver to ask whether the instant action had settled.[4] (Schumacher Decl., ¶ 19.) Oliver did not respond to Schumacher, but instead, immediately forwarded the email to McGeary. (Oliver Decl., ¶ 9.) On April 25, 2006, eight days after Schumacher's inquiry, McGeary sent a letter to Yohannan, copying Gilbertsen and Schumacher, informing Yohannan of the conflict and demanding that Kelley Drye withdraw from representing Defendants. (McGeary Decl., Exh. C.) Upon receipt of the letter, Schumacher notified Steven Caley, General Counsel for Kelley Drye, of the conflict. (Schumacher Decl., ¶ 20.) Caley immediately instructed Schumacher, that he should not:

> (1) do any work on this litigation; (2) discuss this litigation, or [his] work on it, or any other work [he] may have done for Intelli-Check at [his] prior firm, with anyone else at Kelley Drye or Kelley Drye Collier Shannon; (3) read, obtain or maintain any documents, records or files of Kelley Drye or Collier Shannon pertaining to this litigation.

(*Id.* at ¶ 21, Exh. B.) In a sworn statement, Schumacher stated that he would comply with Caley's directives, and that "[at] no time, before or after these screening procedures were established [did

---

[4]     Intelli-Check contends that this communication indicates that Schumacher was on notice of his potential conflict, yet failed to take any action. (Pl. Mem. at 6.) There is a difference between hypothetical and actual conflicts. It would have been preferable that Schumacher informed Kelley Drye prior to the merger; however, there is no indication that he knew whether the instant action remained active at the time of the merger. Once he did learn that the litigation remained active, he took immediate action.

he share] any Intelli-Check confidences or secrets with anyone at Kelley Drye (including former Collier Shannon attorneys and employees) or the defendants." (Schumacher Decl., Exh. E., ¶ 25 .)

On April 26, 2006, Caley emailed Kelley Drye's Washington, D.C., Virginia, New York, New Jersey, Connecticut, and Chicago offices to formally establish the screen. In particular, the email indicated:

> 1) that Schumacher would not work on or be involved with the litigation, 2) that no Kelley Drye personnel would discuss with or seek from Schumacher information regarding the litigation, 3) that Schumacher would be denied access to records and files for the litigation, and 4) that word-processing documents would be secured so that only the Intelli-Check litigation team would have access to them.

(Caley Decl., Exh. C.) Additionally, after the merger, a *de facto* separation remained in place between Schumacher and Defendants' litigation team. First, Schumacher worked in New York and the litigation team worked from the legacy Collier Shannon office located in Washington, D.C.[5] Second, the computer networks of the two legacy firms remained distinct. Legacy Collier Shannon employees had no access to documents created by legacy Kelley Drye employees, and vice versa. (Carns Decl., ¶ 5-6.) Therefore, Schumacher could not access any Tricom documents, as they were created by legacy Collier Shannon attorneys.[6] (Def. Opp. at 6-7.)

---

[5] Intelli-Check disputes this assertion, contending that one member of Defendants' litigation team, William R. Golden, Jr., worked on the case in New York. (McGeary Decl., Ex. F.) This contention lacks merit. Golden's involvement is limited to entering a notice of appearance as local counsel on behalf of Defendants on April 28, 2006. He performed no other work on the case, particularly, no substantive work. Moreover, Golden promptly withdrew once advised of the conflict. (Yohannon Decl., ¶ 5, Ex. A, B.)

[6] Intelli-Check disputes this assertion, contending that no technology barrier existed as legacy attorneys from both firms began using the same email address suffix shortly after merging. This contention misses the point. It was the electronic files and databases that remained separate post-merger. (Carns Decl., ¶¶ 5-7.) Further, unless a legacy Collier Shannon email user granted Schumacher rights to access his or her email account, he would be unable to access the contents of any account. There is no evidence that anyone granted Schumacher such

On June 29, 2006, the parties appeared before the court for a pre-motion conference. Caley represented both Kelley Drye and Schumacher. On June 30, 2006, E. Evans Wohlforth, an attorney for Intelli-Check, sent a letter to Caley asserting that Caley, too, should be ethically screened from the Tricom litigation team, as Caley represented Schumacher in the disqualification dispute and Schumacher might reveal Intelli-Check confidences during the course of this dispute. (McGeary Decl., Exh. D.) Caley rejected Wholforth's proposal, stating that Schumacher was warned repeatedly not to share Intelli-Check confidences, secrets, or privileged information with Caley or any other Kelley Drye attorney. (*Id.*) Caley also noted that he had communicated with Gilbertsen and Yohannan regarding the conflict and would continue to do so as there was "no possibility" that they, or any other Kelley Drye attorneys would learn Intelli-check confidences from him. (*Id.*)

## DISCUSSION

### I. Legal Standards

District courts have broad discretion to determine whether to disqualify counsel. *See Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990); *Papyrus Tech. Corp. v. N.Y. Stock Exch., Inc.*, 325 F. Supp. 2d 270, 275 (S.D.N.Y. 2004). Motions to disqualify based on an attorney's prior representation of a now adverse client are generally disfavored in this Circuit. *See Papyrus Tech. Corp.*, 325 F. Supp. 2d at 275-76. Such motions interfere with the non-moving party's right to freely choose his or her own counsel. *See Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983). Further, such motions often are interposed for tactical reasons and inevitably cause delay. *Id.* at 791-92; *DeFazio v. Wallis*, 459 F. Supp. 2d 159, 163 (E.D.N.Y. 2006). Accordingly, "the Second Circuit has directed that courts faced with disqualification motions take

access.

a 'restrained approach that focuses primarily on preserving the integrity of the trial process.'" *Papyrus Tech. Corp.*, 325 F. Supp. 2d at 276 (quoting *Armstrong v. McAlpin*, 625 F.2d 433, 444 (2d Cir. 1980)). A party seeking disqualification carries a heavy burden of proof and must demonstrate that, absent disqualification, the trial would be tainted. *See Evans*, 715 F.2d at 791; *Eugenia VI Venture Holdings, Ltd. v. Glaser*, No. 05-CV-7262 (DC), 2005 WL 3071268, at *4 (S.D.N.Y. Nov. 15, 2005). Moreover, courts considering disqualification must closely examine the facts of the case and balance a party's right to counsel of choice against the need to maintain the highest standards of the profession. *Id.*; *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, (2d Cir. 1977).

New York Disciplinary Rule 5-108 prohibits a lawyer from representing a client who is adverse to a former client in the same matter except with consent from the former client after full disclosure. N.Y. Comp. Codes R. & Regs. Tit. 22, § 1200.27. New York's Disciplinary Rules, while not binding on federal courts, provide guidance as to the standards for attorneys in conflict of interest situations. *Papyrus Tech. Corp.*, 325 F. Supp. 2d at 276 (citing *Cheng v. GAF Corp.*, 631 F.2d 1052, 1055-56 (2d Cir. 1980)). A disqualifying conflict exists when:

> (1) the moving party is a former client of the adverse party's counsel;
> (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
> (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Evans*, 715 F.2d at 791 (citation omitted).

## II. Application

Intelli-Check seeks Kelley Drye's disqualification on the basis that Schumacher, an associate at Kelley Drye, was formerly employed by the Gibbons law firm, and, while there, represented

Intelli-Check in the instant matter. Defendants do not dispute that the disqualification of Schumacher is appropriate; however, Defendants assert that the disqualification of Kelley Drye is inappropriate as Kelley Drye timely erected an ethical screen. The parties also dispute whether Caley, by nature of his representation of Schumacher, should be subject to the same ethical screen.

## A.    Imputation of Conflict to Kelley Drye

Ordinarily, if an attorney has a conflict with a client, the conflict is imputed to the attorney's entire firm. *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005). Under Disciplinary Rule 5-105, the so-called "imputation rule," "[w]hile lawyers are associated in a law firm, none of them shall knowingly accept or continue employment when any one of them practicing alone would be prohibited from doing so under . . . [(Disciplinary Rule 5-108)] . . . except as otherwise provided therein." N.Y. Comp. Codes R. & Regs. Tit. 22, § 1200.24. Under the imputation rule, a presumption arises that, "if confidences or secrets were disclosed to one member of a firm, each individual attorney in the firm has or may (intentionally or inadvertently) become privy to those confidences." *Papyrus Tech. Corp.*, 325 F. Supp. 2d at 278. In the Second Circuit, this presumption is rebuttable. *Hempstead Video, Inc.*, 409 F.3d at 133. In certain cases, an "ethical screen" that fences the disqualified attorney from the other attorneys in the firm may suffice to rebut the presumption. *See Cheng*, 631 F.2d at 1057; *Papyrus Tech. Corp.*, 325 F. Supp. 2d at 278.

The parties vigorously dispute whether Schumacher played an "appreciable role" in the instant litigation when he was employed by Gibbons. Plaintiff relies heavily on a pronouncement made in *Papyrus Technology Corp.*, that "when an associate has played an 'appreciable role' in representing an adversary in the same matter, a screen will, as a matter of law, fail to rebut the presumption of shared confidences or secrets." 325 F. Supp. 2d at 279 (citing *Kassis v. Teacher's*

*Ins. & Annuity Ass'n*, 93 N.Y.2d 611, 695 N.Y.S.2d 515, 717 N.E.2d 674, 677 (N.Y. 1999)). Defendants rely cases that, in their view, suggest a lawyer can only play an appreciable role in a matter if he or she is a "strategy-maker." *See Papyrus Tech. Corp.*, 325 F. Supp. 2d at 279; *Human Elecs., Inc.*, 375 F. Supp. 2d at 107; *Lambert v. Chase Manhattan Bank, N.A.*, Nos. 93-CV-5298 (LMM), 93-CV- 6876 (LMM), 93-CV- 8270 (LMM), 93-CV-1317 (LMM), 1996 WL 66130, at *1 (S.D.N.Y. Feb. 15, 1996). The court declines to attach importance to such labels. Attorneys can have appreciable roles even if they are not strategy makers. Further, it appears that Schumacher's representation may have satisfied either of these standards; however, despite Intelli-Check's suggestion, the inquiry does not end here. The Second Circuit has made it clear that there is "no categorical rule against considering practices and structures that protect client confidences within a firm in determining whether an attorney or firm should be disqualified." *Hempstead Video, Inc.*, 409 F.3d at 137; *see Hartford Accident & Indem. v. RJR Nabisco, Inc.*, 721 F. Supp. 534, 541 (S.D.N.Y. 1989) (recognizing that as law firms constantly reorganize and attorneys frequently change firms, any *per se* imputation of confidences would unnecessarily increase the "number of disqualification motions, born of little more than hardball litigation strategy sessions and advanced where there is no threat of actual prejudice"). Instead, courts should review the facts and circumstances of a particular case to determine whether disqualification is necessary.

In the instant action, several factors merit the denial of Intelli-Check's motion to disqualify Kelley Drye. First, for a variety of reasons described below, the court finds that the screen was effective. Kelley Drye's size (approximately 420 attorneys) and the *de facto* separation (geographically and technologically) that existed between Schumacher and the Defendants' litigation team at the time of the merger makes inadvertent disclosures unlikely. *Cf. Silver Chrysler Plymouth*

*v. Chrysler Motors Corp.*, 518 F.2d 751, 753-54 (2d Cir. 1975) (indicating that inadvertent disclosures are less likely at large firms); *see Reilly v. Comp. Assocs. Long-Term Dis. Plan*, 423 F. Supp. 2d 5, 11 (E.D.N.Y. 2006) ("[P]hysical separation . . . substantially reduces the chances of inadvertent disclosure . . . ."). This finding is reinforced by affidavits from Schumacher and Yohannon indicating that they had no communication about this case or any other matter. (Schumacher Decl., ¶ 25; Yohannan Decl., ¶ 6.) *See Papyrus*, 325 F. Supp. 2d at 279 (noting that affidavits by the attorneys indicating that they never revealed confidences weighed against imputing liability to the accused firm). Further, Schumacher indicated that he did not disclose Intelli-Check confidences to any legacy Kelley Drye or Collier Shannon attorneys. (Schumacher Decl., ¶ 25.) The court's confidence in the effectiveness of the screen is further reinforced by the fact Schumacher had separated from his old firm almost two years before the conflict arose. It is unlikely that, at the time of the merger, Schumacher's knowledge was central to the ongoing strategies of Intelli-Check. *See Lambert*, 1996 WL 66130, at *1.

Second, Kelley Drye screened Schumacher from the case in a timely manner. *See Papyrus Tech. Corp.*, 325 F. Supp. 2d at 281 (holding that the accused firm timely enacted a screen after learning of an actual conflict from its adversary even though the attorney with the conflict and the accused firm discussed the potential conflict three months earlier). Kelley Drye learned of the conflict when it received the letter from McGeary demanding that it withdraw from representing Defendants. Intelli-Check contends that actual notice should be imputed to Kelley Drye as of April 17, 2006, when Schumacher, one of its agents, learned of the merger.[7] Even under this theory,

---

[7] As noted above, the court is uncertain whether Schumacher had actual knowledge of the conflict at that moment as he did not know whether the instant action was active or if it had settled.

Kelley Drye enacted the screen just days later.  The risk of taint from this minimal delay does not outweigh the risk of harm to Defendants in losing their counsel.  *See Reilly*, 423 F. Supp. 2d at 13 (balancing the "lack of a meaningful showing that the trial process will be tainted in any way . . . against the hardship that disqualification would place on [the non-moving party]").  As set forth above, Kelley Drye enacted an effective screen.  Defendants, two individuals and a closely held corporation, would suffer harm if required to obtain new counsel at this stage in the litigation.  This case was filed over five years ago and the record is voluminous. Mastery of this case would require substantial work on the part of a new firm, at a substantial cost to the Defendants, and a substantial delay to the case.  Additionally, it is worth noting that the Gibbons law firm had notice of the conflict as early as April 17, 2006, but did nothing to alert Kelley Drye at that time.  Instead, the Gibbons law firm waited until April 25, 2006 to provide notice.  The court will not penalize Kelley Drye for this delay when it was within the power of the Gibbons law firm to prevent it as well.

**B.     Schumacher's Relationship with Caley**

Intelli-Check contends that Caley, who represents both Schumacher and Kelley Drye on this motion, must be screened from the instant litigation, as he likely became aware of Intelli-Check confidences during the course of his representation of Schumacher.  (Pl. Mem. at 17-19.)  The court is perplexed as to why Defendants failed to brief this issue in their opposition papers and why Kelley Drye refused to screen Caley.  The appearance of impropriety should be avoided, particularly when it comes at no cost to the accused firm.  Caley was *de facto* separated from the Defendants' litigation team as he worked from the legacy Kelley Drye New York office.  (Caley Decl., ¶ 2.)  He had no involvement with the instant action, other than his involvement with this motion (Caley Decl., ¶ 3.), which is unrelated to the merits of the case.  He repeatedly warned Schumacher to refrain from

discussing any Intelli-Check confidences with him.  (Caley Decl., Ex. D.)  Further, as a member of

Kelley Drye's Ethics and Professional Responsibility Committee, Caley is undoubtedly aware of the

sanctions he would face, had he learned of and revealed any Intelli-Check confidences to the

Defendants' litigation team.  (Caley Decl., ¶ 3.)  In light of these circumstances, the court does not

find that Caley's involvement has created a "substantial hole" in the Schumacher screen; however,

to avoid even the slightest appearance of impropriety, the court directs that Caley be subject to the

same ethical screen for the remainder of this litigation.

## CONCLUSION

For the reasons set forth above, Intelli-Check's motion to disqualify Kelley Drye is denied;

however, Kelley Drye is instructed to screen Caley from the instant action.


SO ORDERED.

DATED:       Brooklyn, New York
             October 21, 2008


_____/s/_____
             DORA L. IRIZARRY
          United States District Judge